IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-01455-NRN

ANNABELLE TRACY,

Plaintiff,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY and
STATE FARM FIRE AND CASUALTY COMPANY,

Defendants.

---

### ORDER ON
### DEFENDANT STATE FARM FIRE AND CASUALTY COMPANY'S MOTION FOR SUMMARY JUDGMENT (ECF No. 36) AND
### PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON HER SECOND CLAIM FOR RELIEF IN PLAINTIFF'S FIRST AMENDED COMPLAINT – DECLARATORY RELIEF (ECF No. 37)

---

**N. REID NEUREITER**
**United States Magistrate Judge**

This matter is before the Court on the consent of the parties. *See* ECF No. 17 (Order of Reference of July 29, 2019). Trial is set to begin on September 8, 2025, before Senior District Judge Christine M. Arguello.

Plaintiff Annabelle Tracy ("Ms. Tracy" or "Plaintiff") and Defendant State Farm Fire and Casualty Company ("State Farm" or "Defendant") have filed competing motions for summary judgement. State Farm's Motion for Summary Judgment is found at ECF No. 36. Plaintiff's Motion for Partial Summary Judgment on Her Second Claim for Relief in Plaintiff's First Amended Complaint—Declaratory Relief is found at ECF No. 37. The

parties filed appropriate responses to the respective motions, *see* ECF Nos. 45 & 46, and the Court heard argument on July 14, 2025, *see* ECF No. 53.

## I.    BACKGROUND

On June 18, 2019, Plaintiff was in a motor vehicle collision in Lakewood, Colorado, where she hit her head and claims to have suffered a mild traumatic brain injury (concussion). Plaintiff settled with the at-fault driver for his policy limits of $25,000 and then brought this case for underinsured motorist benefits against Defendants. This is a breach of contract case only; there is no bad faith claim.

There are two insurance policies at play in this case. The first is an automobile policy with $250,000 in underinsured motorist ("UIM") coverage issued to Plaintiff's father, Michael Tracy, covering the vehicle Plaintiff was driving at the time of the collision (the "Automobile Policy"). There is no debate that Plaintiff is an insured under the terms of that policy, and it is not at issue in connection with the summary judgment motions.

In addition to the $250,000 Automobile Policy, Plaintiff's father purchased and was paying premiums on a $2 million personal liability umbrella policy (the "Umbrella Policy") to provide additional uninsured motorist ("UM") and UIM coverage for himself and his children who were operating the vehicles that he owned and insured. *See* ECF No. 36-1.

The two-million-dollar question raised by the competing summary judgment motions is whether Plaintiff—Mr. Tracy's adult daughter, who had her own apartment but kept a bedroom at her father's house—was an insured under the Umbrella Policy. If Plaintiff was an insured, there is potentially up to $2.25 million in UIM policy benefits

available as damages in this lawsuit. If not, the potential breach of contract damages are limited to the $250,000 UIM coverage limits of the Automobile Policy.

State Farm now seeks a determination that, under the terms of the Umbrella Policy, Plaintiff is not an insured and therefore not entitled to any benefits. By contrast, Plaintiff seeks a ruling that she is an insured as a matter of law under the Umbrella Policy, or that there is at least a sufficient factual question to be decided by a jury.

## II.    UNDISPUTED FACTS

The following facts are taken from the parties' motions and attached affidavits and other documents and are essentially undisputed:

1. At the time of the June 28, 2019 collision, Plaintiff was operating a 2012 Kia Soul owned by her father, Michael Tracy, and insured by him with the Defendants.

2. The 2012 Kia Soul was solely used by Plaintiff with the permission of Michael Tracy.

3. At the time of the collision, Plaintiff was 23 years old. She lived in an apartment in Lakewood, Colorado. Since her parents were divorced, she also kept a bedroom in both of their homes.

4. Prior to June 28, 2019, Michael Tracy purchased the Automobile Policy from State Farm Mutual Insurance Company to cover the 2012 Kia Soul. Said policy was in Mr. Tracy's name and provided UM/UIM coverage in the amount of $250,000 per person/$500,000 per incident.

5. In order to increase the amounts of liability and UIM coverages available to himself and his children, on November 30, 2018, Mr. Tracy purchased the

"Umbrella Policy" from State Farm Fire and Casualty Company. The Umbrella

Policy provided an additional $2,000,000 in personal liability and UIM benefits.

6.  In its "Coverages and Limits," the Umbrella Policy lists "L Personal Liability

$2,000,000," and "U Uninsured and Underinsured Motor Vehicle $2,000,000." In

the section listing "UNDERLYING EXPOSURES," the Umbrella Policy states,

> Our records show the following underlying information. This
> information was used in determining the rate of the policy.
> AUTOMOBILE EXPOSURES
> Automobile(s)                       4
> Automobile Operator(s)        3
> Youthful Operator(s)            1.

ECF No. 36-1.

7.  Mr. Tracy was charged a $1,700 annual premium for the Umbrella Policy, and a

$772.00 portion of this premium was due to Coverage U—the UM/UIM coverage.

*See* ECF No. 37-1 at 3.

8.  Under the Umbrella Policy's Coverage U (UIM coverage), State Farm agreed as

follows:

> We will pay compensatory damages for bodily injury that an insured
> is legally entitled to recover from the owner or operator of an
> uninsured motor vehicle or an underinsured motor vehicle.

> The bodily injury must be:

> 1.  sustained by an insured; and

> 2.  caused by an accident that:

>> a.  occurs during the policy period; and

>> b.  involves the operation, maintenance, or use of an
>>     uninsured motor vehicle or an underinsured motor vehicle
>>     as a motor vehicle.

ECF No. 36-1 at 2.

9.  At the time of the collision, the Umbrella Policy defined an "insured" as "a. you, if a human being; b. relatives who reside primarily with you; and c. a ward or foster child of you or any relative, provided such ward or foster child resides solely with you." ECF No. 36-1.

10. The Automobile and Umbrella Policies were purchased through Mr. Tracy's State Farm agent, Gary Mercer.

11. During Mr. Tracy's discussions with Mr. Mercer, Mr. Tracy advised the agent that multiple vehicles were purchased in his name but would be driven by his adult children and would not be kept at his home.

12. Mr. Tracy advised Mr. Mercer that he wanted to increase his UIM coverages through the Umbrella Policy and wanted those increased coverages to be available to each of his children as well. It was Mr. Tracy's understanding that the Umbrella UIM coverage that he was purchasing would be available to his adult children. He did not understand and was not told by the agent that the Umbrella UIM coverage would not be available to his children who did not reside primarily with him.

13. It is undisputed that, at the time of the collision, Plaintiff did not "reside primarily" with her father. As she testified at her deposition, she lived primarily with her mother or alone in her apartment, although she would stay an occasional night with her father. ECF No. 36-2.

III.    **ARGUMENTS OF THE PARTIES**

    a.  **State Farm's Position**

State Farm's position is both clear and easy to articulate. By its strict written terms, the UIM Umbrella Policy only insured Mr. Tracy and relatives who resided "primarily" with Mr. Tracy. ECF No. 36-1 at 2 (definition of "insured"). It is undisputed that Plaintiff did not "reside primarily" with Mr. Tracy. She had her own apartment. She spent time at her mother's house. She maintained a bedroom at her father's house, where she would stay on occasion. There is an argument that Ms. Tracy "resided" with her father, as a person can have more than one residence, *see Grippin v. State Farm Mut. Auto. Ins. Co.*, 409 P.3d 529, 533 (Colo. App. 2016) ("Colorado law contemplates that a person can 'reside' in more than one place."), but there is no dispute that she did not "reside primarily" with him. A person can only "reside primarily" in one location. *See State Farm Mut. Auto. Ins. Co. v. Clark*, 626 F. Supp. 3d 1163, 1175 (D. Idaho 2022) (explaining that although an individual may be a resident of more than one household for insurance purposes, it is impossible to "primarily reside" in two households at the same time) (citing *Bauer v. USAA Cas. Ins. Co.*, 720 N.W.2d 187, 190 (Wis. Ct. App. 2006)).

State Farm argues that under Colorado law, absent ambiguity, an insurance policy must be enforced as written, giving effect to the plain and ordinary meaning of its terms. *See Terranova v. State Farm Mut. Auto. Ins. Co.*, 800 P.2d 58, 60 (Colo. 1990). It follows that under the unambiguous written terms of the Umbrella Policy, the $2 million of UIM coverage is not available to Plaintiff because she was not an insured under the policy.

**b. Plaintiff's Position**

Plaintiff's position is more complex. Plaintiff takes the position that State Farm's definition of an "insured" in the Umbrella Policy is unduly restrictive and void as against Colorado public policy, under the principles articulated in *Grippin*. In that case, the Colorado Court of Appeals found the definition of "insured" in a Colorado automobile policy, which mirrors the language in this case—"a person, other than you, who *resides primarily* with the first person shown as a named insured" (emphasis added)—to be void as against public policy because the qualifier "primarily" improperly limited Colorado's statutory definition of "insured" found in Colo. Rev. Stat. § 10-4-601(5), part of Colorado's automobile liability insurance statute.

Under this statute, an "insured" is defined as "the named insured, relatives of the named insured *who reside* in the same household as the named insured, and any person using the described motor vehicle with the permission of the named insured." Colo. Rev. Stat. § 10-4-601(5) (emphasis added). The *Grippin* court found that because the automobile policy at issue limited the definition of "insured" to only relatives "primarily" residing with the named insured, it improperly narrowed the statutorily defined class of insureds. The court reached this holding in part because a person can *reside* in two locations at the same time, while a person can only *primarily reside* in one location at one time. *Grippin*, 409 P.3 at 533–34.

Plaintiff argues that, as in *Grippin*, the Umbrella Policy's definition of an "insured" conflicts with the statutory definition. After all, Mr. Tracy did not merely procure a $2 million umbrella policy; he purchased a $2 million umbrella policy that included $2 million in UIM coverage. Per Plaintiff's argument, if limiting language in a normal

automobile policy's UIM provision is restricted by statute, an insurance company that sells additional UIM coverage should not be permitted to impose conditions on that coverage which conflict with Colorado's statutory definition of an "insured."

## IV.    LEGAL STANDARDS

### a.  Federal Rule of Civil Procedure 56

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate when the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Furthermore, a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine if there is a genuine issue for trial. *Tolan v. Cotton*, 572 U.S. 650, 656 (2014).

The moving party bears the initial responsibility of providing the court with the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. *World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

If the movant properly supports a motion for summary judgment, the non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, the opposing party "may not rest on mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Unsupported and/or conclusory allegations do not establish an issue of fact sufficient to defeat summary judgment. *MacKenzie v. City & Cnty. of Denver*, 414 F.3d 1266, 1273 (10th Cir. 2005); *see also McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1398 (10th Cir. 1987); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.").

Conclusory statements based merely on conjecture, speculation, or subjective belief do not constitute competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

Ultimately, the Court's inquiry on summary judgment is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52 (1986). However, "[i]f a party fails to . . . properly address another party's assertion of fact . . . the court may . . . consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e).

### b.  Standards for Interpreting Colorado Insurance Law

In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to "'ascertain and apply the state law.'" *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236 (1944)). The federal court must follow the most recent decisions of the state's highest court. *Id*. "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id*.; *see also Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1132 (10th Cir. 2002) ("[W]here jurisdiction rests solely on diversity of citizenship and there is no controlling decision by the highest court of a state, a decision by an intermediate court should be followed by the Federal court, absent . . . convincing evidence that the highest court of the state would decide otherwise.") (quotation marks and citation omitted).

When interpreting an insurance policy, Colorado courts apply principles of contract interpretation. *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 340 (Colo. 2004). In Colorado, a contract is interpreted according to the plain and ordinary meaning of its language. *Chacon v. Am. Fam. Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990). A court should enforce the insurance contract as written, unless an ambiguity exists. *Ballow v. PHICO Ins. Co.*, 875 P.2d 1354, 1359 (Colo. 1993). "In determining the plain and ordinary meaning of a term in an insurance policy, the Colorado Supreme Court has eschewed the use of 'technical readings' and instead looks to 'what meaning a person of ordinary intelligence would attach to' a policy term." *Sullivan v. Nationwide Affinity Ins. Co. of Am.*, 842 F. App'x 251, 254 (10th Cir. 2021) (quoting *Bailey v. Lincoln Gen.*

*Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011)). A court's construction of policy provisions must be "fair, natural and reasonable rather than strained or strictly technical." *Vill. Homes of Colo., Inc. v. Travelers Cas. & Sur. Co.*, 148 P.3d 293, 296 (Colo. App. 2006), *aff'd*, 155 P.3d 369 (Colo. 2007) (internal quotation marks and citation omitted).

Colorado courts honor "the doctrine of reasonable expectations." *Bailey*, 255 P.3d at 1048. "Courts should not rewrite insurance policy provisions that are clear and unambiguous." *Vill. Homes of Colo., Inc.*, 148 P.3d at 296. "If, based on how an ordinary, objectively reasonable insured would read the policy, the question of whether certain coverage exists is susceptible to more than one reasonable interpretation, then the coverage provisions are ambiguous and must be construed against the insurer as the drafter of the policy." *Todd v. USAA Gen. Indem. Co.*, 713 F. Supp. 3d 1088, 1098 (D. Colo. 2024) (internal quotation marks and citations omitted).

Whether an insurance policy provision violates public policy, and is therefore void and unenforceable, is a question of law for the court to decide. *Bailey*, 255 P.3d at 1045; *Grippin*, 409 P.3d at 531. In determining whether insurance provisions are void as against public policy, a court's primary focus is whether the provisions at issue "dilute, condition, or limit statutorily mandated coverage." *Bailey*, 255 P.3d at 1045. The Colorado Supreme Court has noted that the "'principle that contracts in contravention of public policy are not enforceable should be applied with caution and only in cases plainly within the reason on which the doctrine exists'." *Id*. (quoting *Lowrey v. Zorn*, 9 So.2d 872, 874 (Ala. 1942)). But the basic rule is that when a condition of an insurance policy conflicts with statutorily mandated coverage, the policy provision is void. *Pacheco v. Shelter Mut. Ins. Co.*, 583 F.3d 73, (10th Cir. 2009) (finding automobile insurance

policy's more limited definition of "insured" to conflict with the class of individuals entitled by then-existing no-fault statute to UM/UIM coverage, and holding that an exclusion of resident relatives who own vehicles as "void and unenforceable for the purposes of UM/UIM coverage").

**V.    ANALYSIS**

Based on the undisputed facts and the precise language of the Umbrella Policy, one could jump quickly to the conclusion that Plaintiff is not an insured under that $2 million policy. This is because under no constellation of the facts presented could the Plaintiff be deemed to be residing *primarily* with her father at the time of the accident. A strict application of the terms of the Umbrella Policy would mean Plaintiff was not an insured.

However, if the definitions of "insured" and "resident relative" from Colorado's automobile insurance statute apply instead, then she may be an insured under the Umbrella Policy. The definition of "insured" in Colo. Rev. Stat. § 10-4-601(5) includes *a relative who resides in the same household* as the named insured. And under Colo. Rev. Stat. § 10-4-601(13), the definition of "resident relative" is a "person who, at the time of the accident, is related by blood, marriage, or adoption to the named insured or resident spouse and who resides in the named insured's household, even if temporarily living elsewhere . . . ."

On the question of whether Plaintiff was *residing* in her father's household, the facts are mixed, and the issue could go either way. Under the factors laid out in *Iowa National Mutual Insurance Co. v. Boatright*, 516 P.2d 439 (Colo. App. 1973), to determine whether someone is a "resident" of a household for Colorado insurance

purposes, the finder of fact must examine a number of factors "in light of the basic consideration of whether the parties to the insurance contract intended that coverage would extend to the alleged insured." 516 P.2d at 440. Among these *Boatright* factors are the following: the subjective or declared intent of the individual; the formality or informality of the relationship between the individual and the members of the household; the existence of another place of lodging by the alleged resident; and the relative permanence or transient nature of the individual's residence in the household. *Id.* "No one factor by itself is determinative of the ultimate issue." *Id.*

Considering these factors, there are conflicting facts as to whether Plaintiff was a resident of her father's household, and the question needs to go to the jury. Additionally, there is no debate that Plaintiff did not "primarily reside" with her father. So, to decide whether the Umbrella Policy possibly provides coverage for Plaintiff, the question becomes whether the Umbrella Policy's language defining an "insured" is void as against Colorado public policy because it dilutes, conditions, or limits statutorily mandated coverage. If not, then Defendant is entitled to summary judgment.

The Court ultimately concludes that the Umbrella Policy does limit or condition statutorily mandated coverage and its definition of an "insured" is void. The language of the policy therefore must be reformed to conform to Colo. Rev. Stat. §10-4-601(5), which only requires that a relative claiming coverage "reside" with the insured, rather than "primarily reside."

The starting point for this conclusion is the *Grippin* case. *Grippin* involved an UIM claim by an injured motorcyclist who lived with his family in Colorado Springs, but also regularly lived with grandparents for one week per month at the grandparents' house in

Fort Morgan. The injured motorcyclist sought UIM coverage under his family members' automobile policies. Each policy defined the term "insured" as "you and resident relatives." The policies further defined "resident relative" as "a person, other than you, who *resides primarily* with the first person shown as a named insured. . . ." 409 P.3d at 531 (emphasis added). The insurance company in the *Grippin* case (also a State Farm entity) moved for summary judgment, arguing that the injured motorcyclist was not a "resident relative" of his grandparents under the policies because he did not reside "primarily" at their home in Fort Morgan. *Id*.

The trial court granted summary judgment to the insurer, but the Colorado Court of Appeals reversed, finding that State Farm's definition of "resident relative" improperly narrowed the statutorily defined class of insureds. Relatives who "reside" with the named insured (as determined by the *Boatright* factors), but do not reside "primarily" with the named insured, are included under the statute, but were not included under policy at issue there. *Id*. at 533–34. In reaching this conclusion, the *Grippin* court cited the fact that "Colorado law requires automobile insurance policies to provide UM/UIM coverage 'for the protection of persons insured thereunder who are legally entitled to recover damages from the owners or operators of uninsured motor vehicles,' unless the named insured rejects the coverage in writing." *Id*. at 532 (quoting Colo. Rev. Stat. 10-4-609(1)(a)). UM/UIM coverage must be "coextensive with the class of insureds covered under the liability provision of the policy." *Id*. (quoting *Aetna Cas. & Sur. Co. v. McMichael*, 906 P.2d 92, 98 (Colo. 1995)). Moreover, the Court noted that the General Assembly did not expressly modify or define the word "reside" to restrict the class of insureds only to relatives who reside "primarily" with the named insured. *Id*. at 532–33.

Citing cases that acknowledge a person may reside in more than one household, the *Grippin* court explained that the insurer's definition of "resident relative" narrowed the statutorily defined class of insureds. Therefore, the court found the provision violated Colorado public policy and it was deemed "void and unenforceable." *Id*. at 534.

State Farm says *Grippin* does not apply because the statutory definitions come from Colorado's automobile liability insurance statute, and an umbrella policy is fundamentally different from an automobile policy. Per State Farm, "[n]either [section] 10-4-609 nor any other Colorado law regulates the coverages provided under personal liability umbrella policies." ECF No. 52 at 1–2. Because the Umbrella Policy is not an automobile policy, State Farms asserts that it need not adopt or incorporate the definitions of "insured" from Colorado's automobile liability statute. State Farm argues that umbrella policies are not regulated by the state, so there is nothing inappropriate about State Farm adopting its own definition of an "insured" in its Umbrella Policy. *See id*. at 3 ("Colorado does not regulate the coverages provided under personal liability umbrella policies, and the state's public policy implicitly expressed through its adoption of a minimum UM/UIM recovery system is not otherwise violated under the circumstances here.").

For its argument that Colorado does not regulate personal umbrella policies and an umbrella policy is fundamentally different from an automobile policy, which fall under the mandates of Colo. Rev. Stat. §§ 10-4-601 and 10-4-609, State Farm relies on the decisions by the Colorado Court of Appeals and the Colorado Supreme Court in *Apodaca v. Allstate Ins. Co.*, 232 P.3d 253 (Colo. App. 2009), *aff'd* 255 P.3d 1099 (Colo. 2011).

*Apodaca* involved insureds who were covered as resident relatives under two insurance policies. The first policy insured motor vehicles, and the second policy was an umbrella policy that provided $1 million in excess liability coverage, including, among other things, automobile coverage. (That umbrella policy did not provide UM/UIM coverage). The *Apodaca* plaintiffs were seeking a judicial declaration that, since the insurer had failed to provide or offer UM/UIM coverages under the umbrella policy, the maximum amount of additional UM/UIM coverage should be deemed incorporated into the umbrella policy as a matter of law, following the logic of Colo. Rev. Stat. § 10-4-609(1), which requires an insurer to provide UM/UIM coverage with any automobile policy unless the coverage is rejected in writing.

Both the Colorado Court of Appeals and the Colorado Supreme Court rejected the plaintiffs' position, finding that an insurer selling an umbrella policy is not required to offer UM/UIM coverage under Colo. Rev. Stat. § 10-4-609, as it would with a standard automobile insurance policy. The Court of Appeals stated,

> [W]e have not been cited to, and our research has failed to discover, any Colorado statute or regulation governing or regulating umbrella liability insurance policies, much less expressly governing the marketing, terms or coverages required in such policies. Further [the relevant Colorado insurance statute] governs automobile or motor vehicle liability policies, and not umbrella policies.

*Apodaca*, 232 P.3d at 256–57. Differentiating automobile or motor vehicle insurance policies from umbrella insurance policies, the court continued:

> Automobile or motor vehicle insurance insures the owner or operator of a motor vehicle against liability arising out of the ownership and operation of designated motor vehicles.
>
> The umbrella policy, as above described, in contrast, provides general liability coverage and requires a primary insurance policy with minimum liability limits as to those risks or activities for which specialized liability

16

insurance is generally available and commonly purchased. In addition, umbrella policies are not required, nor are they regulated in Colorado.

*Id*. at 257. Ultimately, the Court of Appeals concluded, based on the plain language of the statute and its context, "umbrella policies are not included under Section 10-4-609 and, thus, are not subject to the UM/UIM coverage requirements of that statute." *Id*. at 258.

The Colorado Supreme Court affirmed, holding "that an umbrella policy is not an 'automobile liability or motor vehicle liability policy; as specified in section 10-4-609(1)(a); therefore, Allstate had no obligation to offer UM/UIM coverage in connection with that umbrella policy." *Apodaca*, 255 P.3d at 1101. The court noted that the while the umbrella policy did include supplemental liability coverage for automobiles, nevertheless, on examination of the plain language of the statute, the "UM/UIM requirements do not apply to general liability policies such as the umbrella policy" at issue in the case. *Id*. at 1102.

The Colorado Supreme Court did however spend time describing the importance of UM/UIM coverage:

> While a traditional auto liability policy protects an insured from liability to third parties, uninsured and underinsured motorist coverage "is not liability insurance in any sense." 9 *Couch on Insurance* § 122:2. Rather, UM/UIM coverage is first-party coverage; it allows an insured to collect payment from his own insurer for injury suffered as a result of the actions of an at-fault uninsured or underinsured driver. *Id*. UM/UIM coverage is inherently complementary to auto liability insurance; both coverages are directly anchored in the activities of driving.
>
> UM/UIM coverage has become widely available in the United States as the result of legislative efforts to provide compensation to insured motorists injured by uninsured or underinsured at-fault drivers who failed to carry adequate liability insurance. *Id*. UM/UIM coverage assures that motorists who have purchased automobile or motor vehicle liability insurance can

obtain compensation from their own insurer in the event they are injured by a negligent driver who lacks adequate liability insurance.

*Id.* at 1103.

The ultimate question in *Apodaca* was whether the statute's requirement—that an insurer offer UM/UIM coverage in connection with any automobile or motor vehicle liability policy—also applied to the umbrella policy. The Colorado Supreme Court held that it did not. In so ruling, the court again differentiated the umbrella policy from the underlying automobile policy:

> The [automobile] policy has a logical and direct connection to the insured's ownership and use of specific, identified automobiles or motor vehicles.
>
> In contrast, the umbrella policy is a general liability policy. The calculation of its "basic liability" premium is not tethered to specific aspects of the policyholder's automobiles or their use. The declarations page simply notes that the premium includes a charge "for 4 automobiles" and "for a young driver." The umbrella policy at issue here is not inherently tied to particular automobiles or motor vehicles, or even the activity of driving. Instead, the purpose of the policy is to provide a broad "umbrella" of general excess third-party coverage to protect the insured from catastrophic liability arising from a wide range of activities. With respect to automobiles, the policy provides excess liability coverage should the insured incur legal liability to others beyond $100,000 per person or $300,000 per accident. But an umbrella policy is not transformed into an "automobile or motor vehicle liability policy" simply because it includes coverage for liability arising from the use of automobiles. An umbrella policy is an inherently different type of policy. As Allstate observes, it would be equally inaccurate to label the umbrella policy an "aircraft policy," "boat policy," or "homeowners policy."
>
> In sum, an umbrella policy is not an "automobile liability or motor vehicle liability policy" under the plain language of section 10–4–609(1)(a). Consequently, the statute does not require an insurer to offer UM/UIM coverage as part of an umbrella policy.

*Apodaca*, 255 P.3d at 1105.

From these authorities, State Farm insists that the statutory definition of "insured" in Colorado's automobile insurance statute cannot be applied to the Umbrella Policy at

issue in this case. Because umbrella policies are not governed or regulated by Colorado, State Farm argues that it should be free to define the terms of its umbrella policies as it sees fit, including the "shifting of risk by limiting the universe of individuals beyond the named insured on the policy who could be entitled to coverage benefits." ECF No. 52 at 8.

What State Farm neglects to address, and what differentiates this case from *Apodaca*, is that Mr. Tracy did not just buy an umbrella policy providing excess liability insurance. He specifically purchased an umbrella policy *that included a UM/UIM endorsement*. *See* ECF No. 36-1 ("UNINSURED AND UNDERINSURED MOTOR VEHICLE COVERAGE (COLORADO)," stating "This endorsement provides Uninsured and Underinsured Motor Vehicle Coverage if 'Coverage U' is listed on the declarations page.").

As *Apodaca* makes clear, State Farm was not obligated under Colorado law to sell or even offer UM/UIM coverage with the Umbrella Policy. But when State Farm did choose to sell UM/UIM coverage in connection with its Umbrella Policy, it brought the policy within the framework of the Colo. Rev. Stat. § 10-4-609 which, by its title, makes clear that it is intended to address "[i]nsurance protection against uninsured motorists." As the Supreme Court said in *Apodaca*, "UM/UIM coverage is inherently complementary to auto liability insurance; both coverages are directly anchored in the activities of driving." 255 P.3d at 1103.

For example, the automobile liability statute specifies that in Colorado, UM coverage must necessarily include UIM coverage. *See, e.g.,* Colo. Rev. Stat. § 10-4-609(4) ("Uninsured motorist coverage shall include coverage for damage for bodily

injury or death that an insured is legally entitled to collect from the owner or driver of an underinsured motor vehicle."). Given this provision, State Farm presumably could not have sold to Mr. Tracy an umbrella policy with UM coverage that did not also include UIM coverage. That would have been against Colorado's public policy, reflected in the statute, which requires that UM and UIM coverage be provided together.

The Court therefore concludes that, having sold UM/UIM coverage in connection with the Umbrella Policy, State Farm cannot limit that coverage in a way inconsistent with the definition of "insured" included in the statutory framework, which is explicitly intended to address "[i]nsurance protection against uninsured motorists." Colo. Rev. Stat. § 10-4-609. To do so would create an incongruity between the expectation of Colorado insureds who buy UIM coverage in connection with their automobile liability policies, and what they are being offered as UM/UIM coverage in connection with an umbrella policy.

For example, in this case, it is not disputed that Plaintiff is covered under the $250,000 UM/UIM coverage issued in connection with the underlying Automobile Policy because she was driving an insured vehicle with the permission of the named insured. However, she could also argue that she is an "insured" under the UM provisions of the Automobile Policy as a "relative of the named insured who resides in the same household as the named insured." *See* Colo. Rev. Stat. § 10-4-601. Yet, State Farm sold the same kind of UM/UIM coverage in connection with both the Automobile Policy and the Umbrella Policy. Again, it would be incongruous for an insured to purchase the same UM/UIM coverage in connection with two policies, with a $250,000 limit on the Automobile Policy and a $2 million limit on the Umbrella Policy, and have the insurer be

allowed to the define an "insured" in the Umbrella Policy in a way that would be impermissible in the Automobile Policy.

State Farm insists that it should prevail on its motion because under *Apodaca*, Colorado does not regulate umbrella policies. But it cannot be doubted that Colorado does regulate UM/UIM policies. And because State Farm sold a UM/UIM policy to Mr. Tracy, State Farm must necessarily accept the statutory definition of "insured" found in Colo. Rev. Stat. §§ 10-4-609 and 10-4-601. The court stated in its *Apodaca* decision that one reason not to require the offering of UM/UIM coverage with the issuance of a general liability umbrella policy is that the "umbrella policy at issue here is not inherently tied to particular automobiles or motor vehicles, or even the activity of driving." *Apodaca*, 255 P.3d at 1105. But having chosen to offer UM/UIM coverage in connection with the Umbrella Policy in this case, State Farm did explicitly tie at least that portion of the policy to the "activity of driving" and to the kind of insurance that *is* regulated by the state. State Farm also charged Mr. Tracy premiums to include UM/UIM coverages with the Umbrella Policy. After all, the endorsement is specifically titled, "UNINSURED AND UNDERINSURED MOTOR VEHICLE COVERAGE." ECF No. 36-1 at 1. By offering UM/UIM coverage, State Farm must accept Colorado's regulatory framework in connection with that coverage, including Colorado's definition of who constitutes an "insured."

## VI.    CONCLUSION

For the foregoing reasons, the Court finds as a matter of law and undisputed fact that State Farm's definition of an "insured" in the Uninsured and Underinsured Motor Vehicle Coverage Endorsement, found at ECF No. 36-1 at 1, to be against Colorado

public policy as articulated in Colo. Rev. Stat. 10-4-601. Accordingly, it is hereby **ORDERED** that State Farm's Motion for Summary Judgment, ECF No. 36, is therefore **DENIED**. The endorsement must be modified to comport with the definitions of "insured" and "resident relative" found at Colo. Rev. Stat. §§ 10-4-601(5) and 10-4-601(13).

It is further **ORDERED** that Plaintiff's Motion for Partial Summary Judgment on Her Second Claim for Relief in Plaintiff's First Amended Complaint—Declaratory Relief, ECF No. 37, is **GRANTED IN PART** and **DENIED IN PART**. To the extent Plaintiff is seeking a declaration voiding State Farm's language in the Umbrella Policy requiring that for a person to be an insured, she needs to "reside primarily" with the named insured, Plaintiff's motion is **GRANTED**. Again, the definition of an "insured" under the UM/UIM endorsement of the Umbrella Policy must conform with the definitions of "insured" and "Resident relative" found at Colo. Rev. Stat. §§ 10-4-601(5) and 10-4-601(13).

However, to the extent Plaintiff seeks a declaration that she is in fact "an insured" under the Umbrella Policy, the motion is **DENIED**. Whether Plaintiff is or is not "an insured" depends in part on the various factors outlined in *Boatright*. These are factual questions for the jury to decide and cannot be determined by the Court on summary judgment.

Date: July 28, 2025

N. Reid Neureiter
United States Magistrate Judge